No. 20-55631

IN THE

# United States Court of Appeals for the Ninth Circuit

NATIONAL PORK PRODUCERS COUNCIL & AMERICAN FARM BUREAU FEDERATION,

*Plaintiff-Appellants,*

v.

KAREN ROSS, et al.,

*Defendant-Appellees,*

and

THE HUMANE SOCIETY OF THE UNITED STATES, et al.,

*Intervenor-Defendant-Appellees.*

On Appeal from the United States District Court
for the Southern District of California
No. 3:19-cv-02324-W-AHG, District Judge Thomas J. Whelan

**BRIEF FOR THE NATIONAL ASSOCIATION OF MANUFACTURERS,
THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
FMI – THE FOOD INDUSTRY ASSOCIATION, THE NATIONAL
CATTLEMEN'S BEEF ASSOCIATION, AND THE NATIONAL MINING
ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF APPELLANT**

Patrick Hedren
Erica Klenicki
MANUFACTURERS' CENTER
FOR LEGAL ACTION
733 10th Street NW
Washington, DC 20001
Phone: (202) 637-3000

*Counsel for National Association
of Manufacturers*

Catherine E. Stetson
Danielle Desaulniers Stempel
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Phone: (202) 637-5600
Fax: (202) 637-5910
cate.stetson@hoganlovells.com

*Counsel for Amici Curiae*

September 30, 2020

*Additional Counsel Listed on Inside Cover*

Additional counsel:

Steven P. Lehotsky
Jonathan D. Urick
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
Phone:  (202) 463-5948

*Counsel for Chamber of Commerce
of the United States of America*

Stephanie K. Harris
FMI – THE FOOD INDUSTRY ASSOCIATION
2345 Crystal Drive
Suite 800
Arlington, VA 22202
Phone: (202) 220-0614

*Counsel for FMI – The Food Industry Association*

Scott Yager
NATIONAL CATTLEMEN'S BEEF ASSOCIATION
1275 Pennsylvania Avenue NW
Suite 801
Washington DC 20004
Phone: (202) 347-0228

*Counsel for National Cattlemen's Beef Association*

Katie Sweeney
NATIONAL MINING ASSOCIATION
101 Constitution Avenue NW
Suite 500 East
Washington, DC 20001
Phone: (202) 463-2600

*Counsel for National Mining Association*

## CORPORATE DISCLOSURE STATEMENT

*Amici* are the National Association of Manufacturers, the Chamber of Commerce of the United States of America, FMI – The Food Industry Association, the National Cattlemen's Beef Association, and the National Mining Association. Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), undersigned counsel certifies that each is a nonprofit trade association, and that each has no parent corporation and no publicly held corporation owns 10% or more of any of *amici*'s stock.

Dated:  September 30, 2020                    /s/ *Catherine E. Stetson*
                                              Catherine E. Stetson

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF COMPLIANCE WITH RULE 29 ...............................................1

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .............................4

ARGUMENT ........................................................................................6

I.   CALIFORNIA'S EXTRATERRITORIAL AND UNDULY
     BURDENSOME PROHIBITION OF PORK SALES
     VIOLATES THE COMMERCE CLAUSE ...................................................6

     A.   Proposition 12 Regulates Extraterritorially..........................................8

     B.   Proposition 12 Will Substantially And Irreparably
          Burden Out-of-State Producers, And No Legitimate
          Local Interest Justifies This Burden....................................................17

II.  ALLOWING PROPOSITION 12 TO TAKE EFFECT
     WOULD GREEN-LIGHT SIMILAR REGULATORY
     EFFORTS NATIONWIDE .......................................................................26

CONCLUSION ...................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937 (9th Cir. 2013) .......................................................................18, 19

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) ...........................................................................................8

*Bonaparte v. Tax Court*,
104 U.S. 592 (1881) ...........................................................................................9

*Boyle v. Zacharie*,
31 U.S. (6 Pet.) 635 (1832) ...............................................................................9

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
476 U.S. 573 (1986) ............................................................................4, 7, 17, 25

*C & A Carbone, Inc. v. Town of Clarkstown*,
511 U.S. 383 (1994) .......................................................................7, 10, 11, 20

*Coyle v. Smith*,
221 U.S. 559 (1911) ...........................................................................................8

*Conservation Force, Inc. v. Manning*,
301 F.3d 985 (9th Cir. 2002) ............................................................................6

*Daniels Sharpsmart, Inc. v. Smith*,
889 F.3d 608 (9th Cir. 2018) .......................................................................6, 8

*Duncan v. Becerra*,
366 F. Supp. 3d 1131 (S.D. Cal. 2019),
*aff'd*, 970 F.3d 1133 (9th Cir. 2020) ..............................................................20

*Exxon Corp. v. Governor of Maryland*,
437 U.S. 117 (1978) ....................................................................................22, 23

*Franchise Tax Bd. of California v. Hyatt*,
139 S. Ct. 1485 (2019) .......................................................................................9

# TABLE OF AUTHORITIES—Continued

Page(s)

*Great Atl. & Pac. Tea Co. v. Cottrell*,
  424 U.S. 366 (1976) ........................................................................10

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) .................................................................*passim*

*Kassel v. Consol. Freightways Corp. of Del.*,
  450 U.S. 662 (1981) ...............................................................21, 29

*Legato Vapors, LLC v. Cook*,
  847 F.3d 825 (7th Cir. 2017) ...................................................*passim*

*Maine v. Taylor*,
  477 U.S. 131 (1986) ..........................................................................6

*N. Am. Meat Inst. v. Becerra*,
  No. 2:19-CV-08569-CAS (FFMx), 2020 WL 919153 (C.D. Cal.
  Feb. 24, 2020) .................................................................................20

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
  682 F.3d 1144 (9th Cir. 2012) ........................................................23

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. National
  Foreign Trade Council*, 530 U.S. 363 (2000) ............................14, 29

*Nat'l Meat Ass'n v. Brown*,
  No. CVF-08-1963 LJO DLB, 2009 WL 426213 (E.D. Cal. Feb. 19,
  2009) ...............................................................................................18

*Nat'l Meat Ass'n v. Harris*,
  565 U.S. 452 (2012) .......................................................................18

*NCAA v. Miller*,
  10 F.3d 633 (9th Cir. 1993) .....................................................*passim*

*New York Life Ins. Co. v. Head*,
  234 U.S. 149 (1914) ..........................................................................9

iv

# TABLE OF AUTHORITIES—Continued

Page(s)

*Ogden v. Saunders*,
  25 U.S. (12 Wheat.) 213 (1827) ..........................................9

*Pharm. Research & Mfrs. of Am. v. County of Alameda*,
  768 F.3d 1037 (9th Cir. 2014) .........................................25

*Pike v. Bruce Church*,
  397 U.S. 137 (1970)...............................................17, 24

*Rocky Mountain Farmers Union v. Corey*,
  730 F.3d 1070 (9th Cir. 2013) .........................................19

*Rocky Mountain Farmers Union v. Corey*,
  913 F.3d 940 (9th Cir. 2019) .......................................19, 25

*Sam Francis Found. v. Christies, Inc.*,
  784 F.3d 1320 (9th Cir. 2015) ............................7, 10, 12, 29

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
  139 S. Ct. 2449 (2019)................................................6, 26, 29

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)...................................................9

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. art. I, § 8, cl. 1..........................................6

U.S. Const. art. I, § 8, cl. 3..........................................6

**STATUTES:**

42 U.S.C. § 7543(e)(2)(A) ...........................................26

Ariz. Rev. Stat. Ann. § 13-2910.07................................15, 27

Cal. Health & Safety Code § 25991(a) ...............................16

Colo. Rev. Stat. § 35-50.5-102 ....................................15, 27

Fla. Const. art. 10, § 21 ...........................................15, 27

## TABLE OF AUTHORITIES—Continued

Page(s)

Me. Stat. tit. 17, § 1039 ......................................................................15, 28

Mich. Comp. Laws § 287.746 ..............................................................15, 28

Ohio Admin. Code 901:12-8-02 ..........................................................15, 28

Or. Rev. Stat. § 600.150 .......................................................................15, 28

R.I. Gen. Laws § 4-1.1-3 ......................................................................15, 28

LEGISLATIVE MATERIAL:

Prevention of Farm Animal Cruelty Act, 2016 Mass. Acts 1052 ......................15, 28

Prevention of Cruelty to Farm Animals Act, Prop. 12 § 2. .....................................20

OTHER AUTHORITIES:

The Federalist No. 22 (Alexander Hamilton) ..........................................................28

Barry Friedman & Daniel T. Deacon, *A Course Unbroken: The Constitutional Legitimacy of the Dormant Commerce Clause*, 97 Va. L. Rev. 1877 (2011) ..............................................................28, 29

Letter from James Monroe to James Madison (July 26, 1785), *available at* https://bit.ly/2SWWhGD .................................................29

Baylen J. Linnekin, *The "California Effect" & the Future of American Food: How California's Growing Crackdown on Food & Agriculture Harms the State & the Nation*, 13 Chap. L. Rev. 357 (2010) ......................................................................18, 22, 28

James Madison, *Vices of the Political System of the United States*, *in* 2 Writings of James Madison 361 (Gaillard Hunt ed., 1901) ..............................28

Susan Lorde Martin, *The Extraterritoriality Doctrine of the Dormant Commerce Clause Is Not Dead*, 100 Marq. L. Rev. 497 (2016) .......................10

Office of the Att'y Gen., *Ballot Initiatives*, State of Cal. Dep't of Justice, https://oag.ca.gov/initiatives (last visited Sept. 30, 2020) ....................19

## STATEMENT OF COMPLIANCE WITH RULE 29

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici curiae* submit this brief without an accompanying motion for leave to file because all parties have consented to its filing. No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 States. Manufacturing employs more than 12 million men and women, contributes $2.25 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for more than three-quarters of all private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

Founded in 1912, the Chamber of Commerce of the United States of America (the Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of

1

more than three million businesses of every size, in every industry, and from every region of the country. Its membership includes businesses across all segments of the economy, including the agriculture and food sectors.

FMI – The Food Industry Association (FMI) works with and on behalf of the entire industry to advance a safer, healthier, and more efficient consumer food supply chain. FMI brings together a wide range of members across the value chain—from retailers that sell to consumers, to producers that supply food and other products, as well as the wide variety of companies providing critical services—to amplify the collective work of the industry.

The National Cattlemen's Beef Association (NCBA) is the largest and oldest national trade association representing American cattle producers. Through state affiliates, NCBA represents more than 175,000 of America's farmers and ranchers, who provide a significant portion of the nation's supply of food. NCBA works to advance the economic, political, and social interests of the U.S. cattle business and to be an advocate for the cattle industry's policy positions and economic interests.

The National Mining Association (NMA) is a trade association representing over 260 corporations and organizations that produce most of America's coal, metals, and industrial and agricultural minerals. NMA's members include manufacturers of mining and mineral processing machinery and supplies,

2

transporters, financial and engineering firms, and other businesses involved in the nation's mining industries.

*Amici* represent their members' interests in matters before Congress, the Executive Branch, and the courts. NAM and the Chamber regularly file *amicus curiae* briefs in cases that raise issues of vital concern to the Nation's business community, including cases involving challenges to state and federal regulations. Like NAM and the Chamber, FMI, NCBA, and NMA have filed *amicus curiae* briefs in cases that implicate issues of special concern to their members. In fact, several of the *amici* are also participating as *amici curiae* in a similar Commerce Clause challenge to Proposition 12 that is pending before this Court. *See* Nat'l Ass'n of Mfrs. et al. Amicus Br., *N. Am. Meat Inst. v. Becerra*, No. 19-56408 (9th Cir. Jan. 10, 2020).

*Amici* have a strong interest in this case because Proposition 12 regulates the conduct of farmers, processors, wholesalers, and retailers nationwide. In addition, Proposition 12, if allowed to stand, may embolden other States to regulate beyond their borders, resulting in a complex web of inconsistent and competing extraterritorial regulations in the agriculture and food industries, and beyond. Fragmenting these interstate markets will create inefficiencies and could impose significant costs on industry and consumers.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

"[T]he Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (internal quotation marks omitted). In holding that Proposition 12—a law that seeks to control the out-of-State production of pork—does not regulate beyond California's borders, the District Court upended that deeply rooted tradition.

State laws violate the Commerce Clause when they regulate extraterritorially or substantially burden out-of-state producers absent a sufficient and legitimate local interest. *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578–579 (1986). Proposition 12 violates the Commerce Clause twice over. First, Proposition 12 plainly regulates beyond California's borders, impinging on other States' sovereign authority to legislate within their own jurisdictions. Second, Proposition 12's ostensible purpose—improving confinement conditions for farm animals—is wholly untethered from any California-specific nexus. Because more than 99% of Proposition 12's effects will take place out-of-state, the substantial and market-distorting compliance costs that

4

will be felt nationwide far outstrip any ancillary benefits that may flow to California consumers.[1]

The District Court ignored these foundational limits and instead held that Proposition 12 does not violate the Commerce Clause. Allowing that erroneous decision to stand spells havoc for our national food supply. If California can enact laws controlling the production of out-of-state pork, so too can Texas dictate how avocados and tomatoes are grown in California. States and localities could also rely on the logic underlying this sales ban to justify setting nationwide standards for virtually any geographically favored industry that is elsewhere disfavored. Allowing States to assert their own policy preferences on farmers, processors, wholesalers, and retailers nationwide will fracture national markets into regional and local affairs. But that future is precisely what the framers intended the Commerce Clause to prevent, as the federal courts have recognized in striking down such regulatory overreaches since the Founding. Proposition 12 is no different. The District Court's decision should be reversed.

---

[1] Although this lawsuit concerns only Proposition 12's unconstitutional regulation of pork, because Proposition 12's regulation of veal will have the same negative effects on that industry, it too violates the Commerce Clause. *See* Nat'l Ass'n of Mfrs. et al. Amicus Br., *N. Am. Meat Inst.*, No. 19-56408.

## ARGUMENT

## I. CALIFORNIA'S EXTRATERRITORIAL AND UNDULY BURDENSOME PROHIBITION OF PORK SALES VIOLATES THE COMMERCE CLAUSE.

The United States Constitution provides that "Congress," and Congress alone, "shall have Power . . . To regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cls. 1, 3. A core purpose of the Commerce Clause is "to prevent state governments from imposing burdens on unrepresented out-of-state interests merely to assuage the political will of the state's represented citizens." *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 998 (9th Cir. 2002) (holding that cap on nonresident hunting designed to increase recreational-hunting opportunities for Arizona citizens is subject to "strict scrutiny" under the Commerce Clause). Although local regulation will often and inevitably have some effects on interstate commerce, that Clause limits States' and localities' ability to "erect barriers against interstate trade." *Maine v. Taylor*, 477 U.S. 131, 137 (1986) (internal quotation marks omitted); *see also Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018) ("The mere fact that some nexus to a state exists will not justify regulation of wholly out-of-state transactions."). The Commerce Clause thus "prevents the States from adopting protectionist measures" and "preserves a national market for goods and services." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).

6

Federal courts apply a "two-tiered approach to analyzing state economic regulation under the Commerce Clause." *Brown-Forman*, 476 U.S. at 578–579. The first tier includes state statutes that "directly regulate[] or discriminate[] against interstate commerce." *Id.* at 579. Such regulations are "virtually *per se* invalid," *id.*, and will be upheld only if the State proves, "under rigorous scrutiny," that there are "no other means to advance a legitimate local interest" available, *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994); *accord NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993). Statutes that impose "only indirect effects on interstate commerce and regulate[] evenhandedly" fall into the second tier. *Brown-Forman*, 476 U.S. at 579. For regulations in this tier, courts employ a balancing test that asks "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.*

Just as States have long claimed the right to use their general police powers to regulate interstate commerce in agriculture and food products, the federal courts have long put those claims to the test and, when appropriate, invalidated those attempts found constitutionally lacking. *See, e.g.*, *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 830–832 (7th Cir. 2017) (holding invalid restrictions on out-of-state vaping manufacturers); *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (same, for the regulation of out-of-state art sales). Proposition 12 is no different. This classic extraterritorial regulation seeks to

control the out-of-state production of pork. And, as with virtually all such regulations, California has not and cannot demonstrate that Proposition 12 survives the rigorous scrutiny the Constitution compels.

Analyzing Proposition 12 as a facially neutral regulation (which it is not) leads to the same result: Any potential interest California might have in enacting this regulation is dwarfed by the substantial burdens it will impose on commerce nationwide. The District Court's contrary conclusion should be reversed.

## A. Proposition 12 Regulates Extraterritorially.

Proposition 12 exceeds the Constitution's limits by seeking to regulate commerce outside California's borders. The doctrine of extraterritoriality prohibits States from "regulating commerce occurring wholly outside [their] borders." *Healy*, 491 U.S. at 332. No matter how wise California or New York or Texas or Vermont may believe a particular policy to be, "[o]ne state cannot be permitted to dictate what other states must do within their own borders." *Daniels Sharpsmart*, 889 F.3d at 615; *accord BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 570–571 (1996).

This principle has deep roots in the Constitution's structure and the Nation's history. State sovereignty is a cornerstone of our constitutional compact and reflects our Country's "union of States, equal in power, dignity and authority." *Coyle v. Smith*, 221 U.S. 559, 567 (1911). "The sovereignty of each State . . .

8

implie[s] a limitation on the sovereignty of all of its sister States"—a limitation that is inherent in "the original scheme of the Constitution." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980); *see also Franchise Tax Bd. of California v. Hyatt*, 139 S. Ct. 1485, 1497–98 (2019). Thus "[n]o State can legislate except with reference to its own jurisdiction." *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881); *see also New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) (calling this territorial limit an "obvious[]" and "necessary result of the Constitution"). When "States pass beyond their own [territorial] limits . . . there arises a conflict of sovereign power . . . which renders the exercise of such a power incompatible with the rights of other States, and with the [C]onstitution of the United States." *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 369 (1827) (opinion of Johnson, J.); *see also Boyle v. Zacharie*, 31 U.S. (6 Pet.) 635, 643 (1832) (Story, J.) (confirming that Justice Johnson spoke for the *Ogden* majority).

Proposition 12's sales ban ignores these foundational bounds on California's authority. That law is the latest—and most consequential—assertion of California's authority over its sister States' regulation of agriculture and food production to date: It requires out-of-state farmers, producers, and distributors to spend hundreds of millions of dollars to restructure their operations nationwide, simply because California voters decided to adopt a particular policy preference. Appellants' Br. 36–45. One State's power to regulate beyond its borders, directly

9

or otherwise, simply does not stretch that far, for "state autonomy over 'local needs' does not inhibit 'the overriding requirement of freedom for the national commerce.'" *Christies, Inc.*, 784 F.3d at 1323 (quoting *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976)).

The District Court's contrary decision gives short shrift to these foundational limits. It recognized—as it must—that the extraterritoriality doctrine exists, and that it applies to regulations like Proposition 12. *See* ER 9; Susan Lorde Martin, *The Extraterritoriality Doctrine of the Dormant Commerce Clause Is Not Dead*, 100 Marq. L. Rev. 497, 498 (2016) (explaining that this doctrine "still serves well the dual purposes of promoting interstate commerce and discouraging hostility among states while each carries out its own policies in its own best interest"). But the District Court failed to meaningfully scrutinize the scope of Proposition 12 because it concluded that the regulated conduct does not take place "wholly" outside California's jurisdiction. ER 9. That argument ignores the teachings of the Supreme Court, this Court, and other courts of appeals; the realities of the national pork supply chain; and the substantial evidence marshalled by Plaintiffs demonstrating that Proposition 12 regulates huge swaths of conduct occurring wholly outside the Golden State.

"States and localities may not attach restrictions to exports or imports in order to control commerce in other States." *C & A Carbone*, 511 U.S. at 393; *see*

*Healy*, 491 U.S. at 336. Proposition 12 does just that. By regulating the manner in which pork farmers house and breed sows, Proposition 12 effectively controls every step of the national pork supply chain. It is common for a sow in, say, Iowa to give birth to piglets, which are then sold to a second facility for feeding, and to a third for finishing. Once they reach the appropriate weight, these pigs are sent to a fourth facility, often in another State—for instance, Illinois—for processing (slaughter and butcher). That processing facility may divide the butchered pork among various wholesalers, retailers, and secondary processors. For example, a wholesaler in Kansas might purchase the loin and sell it to a retailer in California; a retailer in Texas might purchase the pork belly; and a secondary processor in Wisconsin might purchase the shoulder butt to make sausages. *See* Appellants' Br. 5–7, 44–45 (summarizing supply chain process); ER 5–6 (same).

This particular supply chain is hypothetical, but the interstate transactions it describes are not uncommon. And as this supply chain demonstrates, by regulating the California-based retailer's purchase, Proposition 12 will inevitably affect multiple wholly out-of-California transactions. That violates the Commerce Clause. *See Healy*, 491 U.S. at 336; Mot. for J. on the Pleadings (MJP) at 8, D. Ct. Dkt. No. 19 (acknowledging that laws which have "inevitable effects" in other States violate the Commerce Clause (internal quotation marks and brackets omitted)). To comply with Proposition 12, the breeding farm in Iowa must alter

how it houses the sow; the feeding and finishing facilities in Iowa must segregate Proposition 12-compliant pigs; the processing facility in Illinois must track the origins of each pig it butchers; and the wholesalers and retailers in Kansas and California must track the origins of each whole cut of pork. *See* Appellants' Br. 41–45; ER 5–6. These out-of-state impacts far exceed the kind of incidental requirements associated with labeling regimes and other facially neutral laws. Because the "practical effect of th[is] regulation is to control" commercial transactions that "take[] place wholly outside of the State's borders, whether or not the commerce has effects within the State," Proposition 12 "exceeds the inherent limits of [California's] authority." *Healy*, 491 U.S. at 336 (internal quotation marks omitted).

Not surprisingly, recent decisions from this Court and other courts of appeals have invalidated similar laws that sought to regulate beyond a State's borders. For example, in *Christies*, the en banc Court held that California's Resale Royalty Act violated the Commerce Clause because it regulated sales of fine art "that take place outside California" with "no necessary connection with the state other than the residency of the seller." 784 F.3d at 1323 (explaining that this law would have required a purchaser in New York to pay a royalty to a sculptor in North Dakota, "even if the sculpture, the artist, and the buyer never traveled to, or had any connection with, California"). And in *NCAA v. Miller*, this Court

12

invalidated a Nevada law that would have required the NCAA to apply Nevada's rules to all NCAA institutions in all States. 10 F.3d 633 (9th Cir. 1993). As this Court explained, because the statute would "control the regulation of the integrity of a product in interstate commerce that occurs wholly outside Nevada's borders," it had the "sort of extraterritorial effect . . . forbidden by the Commerce Clause." *Id.* at 639.

Likewise, in *Legato Vapors*, the Seventh Circuit rejected Indiana's attempt to "dictate[] how out-of-state manufacturers" of electronic cigarettes and vaping devices that sold products in Indiana "must build and secure their facilities, operate assembly lines, clean their equipment, and contract with security providers." 847 F.3d at 830. That law, like Proposition 12, reflected "direct regulation of out-of-state facilities and services," and carried significant and costly consequences by requiring out-of-state manufacturers to restructure their operations. *Id.* at 834. Indiana, like California here, argued that the Act was "facially neutral," regulated activities "not wholly outside Indiana," and "applie[d] equally to in-state and out-of-state manufacturers." *Id.* at 830. But the Seventh Circuit rejected those arguments because the practical effects of Indiana's vaping regulations on out-of-state entities, like Kentucky-based Legato Vapors, went beyond the "mere incidental effects of a facially neutral law." *Id.* at 830, 834. Although "reasonable and even-handed purity requirements on vaping products sold in Indiana" may well

be constitutionally permissible, the State could "not try to achieve that goal by direct extraterritorial regulation of the manufacturing processes and facilities of out-of-state manufacturers." *Id.* at 834; *see* Appellants' Br. 52–55 (explaining that proposed rules for implementing Proposition 12 would require out-of-state pork farmers and processors to consent to inspections by California regulators and to comply with California's record-keeping requirements).

Similarly, the First Circuit sustained a challenge to a Massachusetts law restricting the Commonwealth's ability to purchase goods or services from companies that did business with the country of Burma (now Myanmar) in *National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000). The statute was enacted in response to human-rights violations committed by the Burmese Government based on "the historic concerns of the citizens of Massachusetts with supporting the rights of people around the world." *Id.* at 47 (internal quotation marks omitted). Though the case arose under the Foreign Commerce Clause, the First Circuit recognized—and properly enforced—the same limits on Massachusetts's assertion of extraterritorial authority as an independent ground for invalidating that sales ban. Because "both the intention and effect of the statute [was] to change conduct beyond Massachusetts's borders," the Commonwealth ran afoul of the constitutional principle that a State "may not regulate conduct wholly

14

beyond its borders." *Id.* at 69 (citing *Healy*, 491 U.S. at 336). Notably, the First Circuit also rejected Massachusetts's argument that "a company doing business with Burma can simply forgo contracts with Massachusetts," because allowing "state laws to stand on this ground" would "read the Commerce Clause out of the Constitution." *Id.* at 70 ("If Massachusetts can enact a Burma law, so too can California or Texas.").

Proposition 12 also creates a high risk that members of the out-of-state pork supply chain will face conflicting regulations, which reinforces its impermissibly extraterritorial effect. *See Healy*, 491 U.S. at 336–337; *Legato Vapors*, 847 F.3d at 834; *NCAA*, 10 F.3d at 639–640. Massachusetts has a similar sales ban that also applies extraterritorially, *see* Prevention of Farm Animal Cruelty Act, 2016 Mass. Acts 1052, and Arizona, Colorado, Florida, Maine, Michigan, Ohio, Oregon, and Rhode Island have enacted their own sow housing standards, *see* Ariz. Rev. Stat. Ann. § 13-2910.07; Colo. Rev. Stat. § 35-50.5-102; Fla. Const. art. 10, § 21; Me. Stat. tit. 17, § 1039; Mich. Comp. Laws § 287.746; Ohio Admin. Code 901:12-8-02; Or. Rev. Stat. § 600.150; R.I. Gen. Laws § 4-1.1-3; *see also* MJP at 4 (recognizing that after California enacted the precursor regulation, Proposition 2, "several other states have followed suit"). And fifteen States filed an amicus brief in support of Plaintiffs below, explaining that Proposition 12 is "a substantial departure from [their] current practices." Amicus Br. of States of Indiana,

Alabama, Arkansas, Iowa, Kansas, Louisiana, Missouri, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and West Virginia at 2, D. Ct. Dkt. No. 32 ("States' Amicus Br.").

A sow can only be housed one way at a given time, so if a farmer, feeder, finisher, processor, wholesaler, or retailer is located in a State that imposes a conflicting mandate—perhaps that no pork processed or sold in that State may come from gilts bred before they are seven months old, and that gilts must be housed in group pens until they are bred—it will be forced to choose between complying with its home-state regulation or Proposition 12. *Compare* Cal. Health & Safety Code § 25991(a), *and* ER 100 (explaining that to comply with Proposition 12, six-month-old gilts must be housed individually), *with* Appellants' Br. 9 n.4 (explaining that farmers typically house gilts in group pens until they are bred at seven months). *Contra* Amicus Br. of Ass'n of Cal. Egg Farmers at 15–16, D. Ct. Dkt. No. 25 ("Pork products are not like a truck that cannot feasibly be subjected to different regulations by each state it passes through."). Thus, just as in *NCAA* and *Legato Vapors*, because several other States have already moved to regulate the same conduct and more are likely to do the same, the "risk of inconsistent obligations wrought by the extraterritorial effect of" Proposition 12 is sufficient to demonstrate that it violates the Commerce Clause. *NCAA*, 10 F.3d at 640; *see Legato Vapors*, 847 F.3d at 834 ("the threat of inconsistent regulation . . .

16

is enough to show why Indiana cannot impose these . . . requirements on out-of-state manufacturers").

California has no more power to regulate beyond its borders than Indiana or Massachusetts. If it did, California could freely subject people nationwide to regulations that conflict with the policies adopted by their own States. This Court should reiterate these straightforward constitutional truths, and hold that Proposition 12 violates the Commerce Clause.

### B. Proposition 12 Will Substantially And Irreparably Burden Out-of-State Producers, And No Legitimate Local Interest Justifies This Burden.

Proposition 12 also flunks the Commerce Clause's test for facially neutral regulations that impose *indirect* effects on interstate commerce. Such regulations are permissible only if the State has a "legitimate" interest in that regulation, and "the local benefits" of the regulation "clearly exceed[ ]" the "burden on interstate commerce." *Brown-Forman*, 476 U.S. at 579; *see Pike v. Bruce Church*, 397 U.S. 137, 142 (1970). Setting aside the substantial evidence that Proposition 12 regulates commerce that takes place outside of California and puts the pork supply chain at risk of conflicting regulations, it still cannot pass muster: California has no legitimate local interest in regulating the manner in which pork is produced outside the State's borders. And even if there were such an interest, any gains to

17

the State and its citizens are dwarfed by the compliance costs and market distortions that this law will impose nationwide.

Proposition 12 is not California's first foray into America's larder. The past fifteen years have seen a dramatic uptick in far-reaching food regulation from a small group of States, California chief among them. Indeed, the regulatory impulse for "wealthy, powerful states" to exercise their "outsized influence" to adopt preferred regulatory regimes that are effectively binding not just "within the home state but also [o]n others who trade with that state" is so linked to the Golden State that scholars refer to it as the "California Effect." Baylen J. Linnekin, *The "California Effect" & the Future of American Food: How California's Growing Crackdown on Food & Agriculture Harms the State & the Nation*, 13 Chap. L. Rev. 357, 373 (2010). To date, California's increasingly ambitious efforts to reshape the nation's food chain in the State's own image have had mixed success. *Compare, e.g.*, *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012) (holding California meat-processing regulations designed to restructure slaughterhouse operations preempted by the Federal Meat Inspection Act), *and Nat'l Meat Ass'n v. Brown*, No. CVF-08-1963 LJO DLB, 2009 WL 426213, at *11 (E.D. Cal. Feb. 19, 2009) (same, and declining to reach Commerce Clause argument in light of preemption holding), *with Ass'n des Eleveurs de Canards et d'Oies du Quebec v.*

18

*Harris*, 729 F.3d 937 (9th Cir. 2013) (rejecting constitutional challenges to force-feeding ban in foie gras production).

Whatever the outer line on California's legitimate authority to regulate out-of-state activity that touches on its citizens, Proposition 12 far exceeds that mark. Starting with the putative benefits of Proposition 12's sales ban, that side of the scale is empty because the State has *no* legitimate interest in controlling out-of-state activity that does not threaten to harm *California* consumers.

This Circuit's case law is unambiguous that a State is empowered to regulate in a manner that burdens interstate commerce only to address "*local* harms," *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1103–04 (9th Cir. 2013) (emphasis added), or "minimize the *in-state* harm caused by products sold in-state," *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 952–953 (9th Cir. 2019) (emphasis added) (explaining that California is not empowered to regulate fuel production and use merely because "it thinks that it is the state that knows how best to protect Iowa's farms, Maine's fisheries, or Michigan's lakes").

As it appeared in the ballot initiative ratified by California voters,[2] Proposition 12's stated purpose is "to prevent animal cruelty by phasing out

---

[2] The ballot-initiative process is a uniquely Californian governance tool that allows "California citizens a way to propose laws and constitutional amendments without the support of the Governor or the Legislature." Office of the Att'y Gen., *Ballot Initiatives*, State of Cal. Dep't of Justice, https://oag.ca.gov/initiatives (last visited

extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California." Prevention of Cruelty to Farm Animals Act, Prop. 12 § 2. Before the District Court, Defendants rested solely on the first rationale—the prevention of animal cruelty. MJP at 14 (acknowledging that the purpose of Proposition 12 is "to prevent animal cruelty"); Mot. to Dismiss (MTD) at 2–3, D. Ct. Dkt. No. 18-1 (same). As Plaintiffs explain, Proposition 12 does nothing to advance that goal. Appellants' Br. 73–75. Nevertheless, that rationale is wholly untethered from any California nexus when applied to the *out-of-state* production of pork. *See C & A Carbone*, 511 U.S. at 393 (holding a locality's desire to minimize its own environmental footprint does not justify the regulation of out-of-state commerce); *see also N. Am. Meat Inst. v. Becerra (NAMI)*, No. 2:19-CV-08569-CAS (FFMx), 2020 WL 919153, at *8 (C.D. Cal. Feb. 24, 2020) (holding that NAMI adequately alleged that California lacked a "legitimate local interest in farming conditions in other states").

As for California's claim that Proposition 12 also aims to protect the health and welfare of California consumers, that too falls flat. The mere "incantation of a

Sept. 30, 2020). Because ballot initiatives like Proposition 12 are necessarily devoid of legislative findings "[n]o federal court has deferred to the terms of a state ballot proposition where the proposition trenches on a federal constitutional right." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1167 (S.D. Cal. 2019) (collecting cases), *aff'd*, 970 F.3d 1133 (9th Cir. 2020).

purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (plurality op.). Thus, even if Proposition 12 was designed for that "purpose"—a claim wholly devoid of any evidentiary support, *see* Appellants' Br. 72—because there is no evidence that this regulation has incidental health or safety benefits specific to California consumers, "the State's safety interest [is] illusory," *Kassel*, 450 U.S. at 671. *See also NAMI*, 2020 WL 919153, at *8 (finding that NAMI adequately alleged that "there is no scientific data connecting Proposition 12's confinement standards to the prevention of foodborne illness within California").

In any event, the concrete, imminent, and excessive compliance burdens that Proposition 12 would impose on non-California residents subsume any potential cognizable benefit to California consumers. The District Court reached a contrary conclusion only by ignoring the well-pleaded allegations in the complaint and by applying the wrong legal standard. Appellants' Br. 68–69. As Plaintiffs explain, the State's demand for pork requires approximately 673,000 breeding sows, but California farms house only about 1,500 breeding sows. Appellants' Br. 7–8, 66; *see* ER 6 (acknowledging that "California's in-state sow breeding does not supply the demand of pork consumption in the state"). In other words, *99.8%* of sows affected by Proposition 12 are located out-of-state. And that eye-popping statistic

does not account for the numerous *other* stages of the out-of-state supply chain that Proposition 12 will inevitably affect. *See* Appellants' Br. 35–45; ER 5–6. For example, even if only one-third of a farmer's or packer's products are sold in California, the farmer might decide (on his own, or pursuant to the packer's demand), to restructure his entire production process to comply with Proposition 12. *See* Appellants' Br. 68; ER 250–251 (explaining that the farmer must ensure all of his sows are housed in compliance with Proposition 12, even though only about one-third will produce pork that is eventually sold in California). As a result, the total cost of complying with Proposition 12 will easily reach into the millions of dollars. *See* Appellants' Br. 68 (explaining Proposition 12 will increase pork-production costs "by 9.2%").

It is no surprise that California's law will result in a restructuring of pork supply chains across the nation. That is, after all, the whole point of these paternalist, "California-knows-best" style laws. "The California effect has meant that the state's food regulations and bans extend far beyond its borders, either because its regulations or bans encourage other states or the federal government to adopt them, or because they force producers to change their offerings nationwide, or because they force the regulated industry to seek preemptive nationwide regulation." Linnekin, *supra*, at 384–385. That necessarily disrupts the "natural functioning of the interstate market," *Exxon Corp. v. Governor of Maryland*, 437

U.S. 117, 127 (1978) (internal quotation marks omitted), and "impair[s] the free flow of materials and products across state borders," *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1154–55 (9th Cir. 2012).

Neither the District Court nor Defendants offered a response to these compelling statistics. The District Court concluded that Proposition 12 would not impede "the flow of pork across state lines," and that "Plaintiffs have not alleged that Proposition 12 will require a uniform system of regulation." ER 13. But that is precisely what Proposition 12 will do, and exactly what Plaintiffs have alleged: By requiring all pork producers to alter their sow-housing practices and restructure their supply chains, Proposition 12 imposes substantial compliance costs, which could readily disrupt the national pork supply chain. Appellants' Br. 39–42, 66–68. And because of the unique structure of the pork industry, and because Proposition 12 regulates the whole pig and 99.8% of California's pork is produced out-of-state, Proposition 12 will effectively require pork producers nationwide to comply with California's policy judgment. Appellants' Br. 41–42, 66, 68.

Defendants, for their part, argued that this substantial burden on interstate commerce was immaterial because Proposition 12 merely "precludes a preferred, more profitable method of operating in a retail market." MJP at 11 (internal quotation marks omitted); MTD at 11 (internal quotation marks omitted). In other words, because Proposition 12 is directed to *how* meat products are produced, not

*where*, Defendants contended that there is no need to perform the balancing test mandated by *Pike*. *See* MJP at 11–12; MTD at 11.

Not so. There is no "production method" exception that categorically exempts otherwise-burdensome regulations from *Pike*'s balancing test. *See* 397 U.S. at 144–145 (enjoining an order requiring interstate cantaloupe growers to make "a capital expenditure of approximately $200,000" to pack fruit in Arizona because the law was extremely burdensome and the State had only a "tenuous interest in having the company's cantaloupes identified as originating in Arizona"). For good reason. Were States simply permitted to skirt the Constitution's structural limits on regulations affecting interstate commerce by framing away obvious real-world harms as merely the removal of a potential "production method," that would effectively immunize *any* local regulation, regardless of the extent or reach of its effects, from Commerce Clause scrutiny.

As for Defendants' claim that Proposition 12 might somehow *help* out-of-state producers by allowing them "to participate in the broader national and international market for humanely raised meat products," MJP at 13, that is wholly speculative, not to mention irrelevant.[3] Unlike Plaintiffs—who provided detailed declarations demonstrating the harm Proposition 12 will cause, *see* ER 137–140,

---

[3] The District Court did not reach this balancing step of the *Pike* analysis. *See* ER 14. As Plaintiffs explain, "there is no need for this Court to remand for the district court to conduct the necessray balancing in the first instance." Appellants' Br. 71.

24

158–159, 199–204, 211–212, 219–220, 226–227, 231–233, 245–246, 250–252, 258–263—Defendants offered no support for their claims. As Defendants recognized, where a party "provide[s] no evidence" to support its claim that a state regulation will affect "the 'flow of goods,'" the court cannot rely on that bare speculation in the Commerce Clause analysis. *Pharm. Research & Mfrs. of Am. v. County of Alameda*, 768 F.3d 1037, 1045 (9th Cir. 2014); *see* MJP at 13 (citing *Alameda*). But even if Defendants were correct that complying with Proposition 12 might be good for out-of-state farmers' bottom lines, that is irrelevant. The Commerce Clause requires courts to balance "the burden on interstate commerce" against "the *local* benefits." *Brown-Forman*, 476 U.S. at 579 (emphasis added). Individual producers and the States in which they reside are free to make this policy choice of their own accord. Assuming that California knows best and can make that choice for them is Golden State paternalism at its finest. *See Rocky Mountain*, 913 F.3d at 953 (California is not empowered to enact out-of-state regulations simply because "it thinks that it is the state that knows how best to protect Iowa's farms, Maine's fisheries, or Michigan's lakes").

Applying the proper standard and balancing Proposition 12's wholly speculative and at-most-minimal health and safety benefits against these enormous burdens on interstate commerce demonstrates that the District Court's decision should be reversed.

## II. ALLOWING PROPOSITION 12 TO TAKE EFFECT WOULD GREEN-LIGHT SIMILAR REGULATORY EFFORTS NATIONWIDE.

Allowing Proposition 12 to stand will be an invitation to States and localities across the country to engage in similar regulatory efforts in the agriculture and food sectors, and beyond. The resulting regulatory race to the bottom would be harmful to our national economy and leave us "with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising." *Tennessee Wine & Spirits*, 139 S. Ct. at 2460.

California has no inherent right to impose its preferred regulatory policies on the rest of the nation. Although the federal government sometimes expressly authorizes the State to adopt its own regulatory standards on certain topics of unique interest, *cf.* 42 U.S.C. § 7543(e)(2)(A) ("authoriz[ing] California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines" that are more stringent than "Federal standards"), California has no similar authority when it comes to the production of pork. And absent such authority, California—like every other State and locality—is bound by the Commerce Clause, which prohibits the enactment of laws that, like Proposition 12, regulate beyond its borders and unduly burden out-of-state producers.

That makes sense. If California can assert legal control over out-of-state meat production, then Indiana can do the same when it comes to Kentucky's e-

cigarette manufacturers, and North Dakota can regulate New York's art transactions. As these examples demonstrate, this impulse is not limited to food. States could rely on a similar theory to regulate supply chains in virtually any industry. Under the District Court's approach, the Commerce Clause would not stop New Jersey from asserting its say over how Michigan makes cars, simply because some of those cars are eventually sold by Garden State dealerships. Nor would it prevent Texas from laying claim to how the clothing supply chain must operate in North Carolina, because some of that clothing is later sold by Lone Star retailers. Now multiply that disruption by fifty, because if California or New Jersey or Texas is permitted to impose such a prohibition, so too can every other State.

These risks are not hypothetical. Proposition 12 will force out-of-state pork farmers, feeders, finishers, processors, wholesalers, and retailers to choose between spending significant sums of money to update their entire supply lines to conform with California's view of the appropriate standards, creating separate production and distribution lines for this one State, or withdrawing from the highly lucrative California market. *See* Appellants' Br. 36–40. Moreover, Arizona, Colorado, Florida, Maine, Massachusetts, Michigan, Ohio, Oregon, and Rhode Island have already enacted separate sow housing requirements or sales bans. *See* Ariz. Rev. Stat. Ann. § 13-2910.07; Colo. Rev. Stat. § 35-50.5-102; Fla. Const. art. 10, § 21;

Me. Stat. tit. 17, § 1039; Prevention of Farm Animal Cruelty Act, 2016 Mass. Acts 1052; Mich. Comp. Laws § 287.746; Ohio Admin. Code 901:12-8-02; Or. Rev. Stat. § 600.150; R.I. Gen. Laws § 4-1.1-3. There is a serious risk that other localities will follow suit, resulting in a patchwork of regulatory requirements that will effectively eliminate the national pork market. *See* Linnekin, *supra*, at 366–367, 385, 387 (explaining that, after California banned trans fats, "dozens of discordant state laws" followed); *see* MJP at 4 (acknowledging that after California enacted Proposition 2, several other localities followed suit); States' Amicus Br. at 2 (States' amicus brief explaining that Proposition 12 is "a substantial departure from [their] current practices").

These are precisely the fears that motivated the creation of the Commerce Clause. As James Madison explained, allowing States to restrict commerce and impose requirements on producers and suppliers beyond their borders "tends to beget retaliating regulations." *See* James Madison, *Vices of the Political System of the United States*, *in* 2 Writings of James Madison 361, 363 (Gaillard Hunt ed., 1901). Alexander Hamilton likewise worried that, if allowed to "multip[y] and extend[]," "[t]he interfering and unneighborly regulations of some States" would become "serious sources of animosity and discord." The Federalist No. 22 (Alexander Hamilton); *see also* Barry Friedman & Daniel T. Deacon, *A Course Unbroken: The Constitutional Legitimacy of the Dormant Commerce Clause*, 97

Va. L. Rev. 1877, 1885–86 & n.29 (2011) (collecting other examples of the founders' "references to the nation's commercial woes, including discord among the states"); Letter from James Monroe to James Madison (July 26, 1785) (explaining that allowing the States to pursue separate commercial policies "establish'd deep-rooted jealousies & enmities between them" which, if allowed to persist, "will become instrumental in their hands to impede & defeat those of each other").[4]

For nearly two hundred years, the Supreme Court and courts of appeals have heeded the framers' concerns and prevented States from regulating beyond their borders, and acting in a way that burdens interstate commerce absent a sufficiently strong and legitimate local interest. *See Tennessee Wine & Spirits*, 139 S. Ct. at 2459 (summarizing the origins of this Commerce Clause concept); *see also, e.g.*, *Kassel*, 450 U.S. 662; *Legato Vapors*, 847 F.3d 825; *Christies*, 784 F.3d 1320; *Natsios*, 181 F.3d 38. The District Court's decision breaks with that long tradition, and should be reversed.

---

[4] *Available at* https://bit.ly/2SWWhGD.

## CONCLUSION

For these reasons, the District Court's denial of preliminary injunctive relief should be reversed.

September 30, 2020

Patrick Hedren
Erica Klenicki
MANUFACTURERS' CENTER
FOR LEGAL ACTION
733 10th Street NW
Washington, DC 20001
Phone: (202) 637-3000

*Counsel for National Association of Manufacturers*

Steven P. Lehotsky
Jonathan D. Urick
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
Phone: (202) 463-5948

*Counsel for Chamber of Commerce of the United States of America*

Stephanie K. Harris
FMI – THE FOOD INDUSTRY ASSOCIATION
2345 Crystal Drive
Suite 800
Arlington, VA 22202
Phone: (202) 220-0614

*Counsel for FMI – The Food Industry Association*

Respectfully submitted,

/s/ *Catherine E. Stetson*

Catherine E. Stetson
Danielle Desaulniers Stempel
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Phone: (202) 637-5600
Fax: (202) 637-5910
cate.stetson@hoganlovells.com

*Counsel for Amici Curiae*

Scott Yager
NATIONAL CATTLEMEN'S BEEF ASSOCIATION
1275 Pennsylvania Avenue NW
Suite 801
Washington DC 20004
Phone: (202) 347-0228

*Counsel for National Cattlemen's Beef Association*

Katie Sweeney
NATIONAL MINING ASSOCIATION
101 Constitution Avenue NW
Suite 500 East
Washington, DC 20001
Phone: (202) 463-2600

*Counsel for National Mining Association*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,715 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

/s/ *Catherine E. Stetson*
Catherine E. Stetson

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system on September 30, 2020.

/s/ *Catherine E. Stetson*
Catherine E. Stetson